IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CR204 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| ANTHONY P. PURDY, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Anthony P. Purdy's (Purdy) Motion to Suppress (Filing No. 14). The defendant is charged in the Indictment with possession of a firearm after previously being convicted of a felony in violation of 18 U.S.C. § 922(g)(1).  **See** Filing No. 1. The charges arise after a traffic stop involving the defendant on October 15, 2004, and a related buccal swab forcibly taken from the defendant by officers on April 14, 2005. The defendant seeks to suppress the results of the buccal swab. The defendant contends the swab was an unconstitutional search.

The Court held an evidentiary hearing for the motion to suppress on August 9, 2005. At the hearing, the Court heard the testimony of Omaha Police Department (OPD) Officers John K. Villwok (Officer Villwok) and Bruce A. Rima (Officer Rima), OPD Detective Eric L. Schlapia (Detective Schlapia), OPD Detention Unit Supervisor Petra Young (Ms. Young), Douglas County Corrections Center (DCCC) Officer Matthew Doll (Officer Doll), DCCC Sergeant David Aldrich, Jr. (Sergeant Aldrich) and the defendant. The Court received into evidence a request for crime laboratory services (Exhibit 1), a property report (Exhibit 101), a drawing by Officer Doll (Exhibit 102), and medical records (Exhibit 103). A transcript (TR.) was prepared and filed in this matter on August 16, 2005. **See** Filing No. 39. The defendant filed a pre-hearing brief (Filing No. 15) and, on August 17, 2005, a post-hearing brief (Filing No. 40). The government filed a pre-hearing brief (Filing No. 30).

## FINDINGS OF FACT

Officers Villwok and Rima are patrol officers with OPD and were working in that capacity on October 15, 2004, at approximately 2:50 a.m. (TR. 4, 19-20). Officers Villwok and Rima were traveling eastbound on Dodge Street at about 40th Street in a marked police cruiser (TR. 5). The officers observed a white Chevrolet traveling westbound without registration plates, which is a violation of state statute (TR. 5, 20). Officer Rima turned the police cruiser around at 39th and Dodge Streets to follow the white vehicle (TR. 5, 21). Officer Villwok watched the vehicle approach 40th Street and prepare to make a right turn (TR. 6). At that time, the front passenger door of the vehicle opened approximately half-way (TR. 6, 22). However, the officers did not see or hear an item being thrown from the vehicle (TR. 11, 22). The officers lost sight of the vehicle momentarily as the vehicle traveled northbound (TR. 6). The officers observed two people in the vehicle (TR. 6-7). The officers activated the emergency lights and stopped the vehicle approximately one block north of Dodge Street (TR. 7, 17-18, 23).

The vehicle's passenger was the defendant, Purdy (TR. 7, 24). Purdy appeared nervous and fidgety (TR. 8, 24). A data check revealed Purdy was a convicted felon and there was an existing warrant for Purdy's arrest (TR. 8). Purdy informed the officers he had a crack pipe on him and the officers discovered two pipes (TR. 8). Purdy stated he had opened the vehicle's door because he was getting sick (TR. 11). However, based on his experience and training, Officer Villwok believed Purdy had opened the passenger door to either flee or to throw an item out of the vehicle (TR. 9). Officer Wilie returned to the corner of 40th and Dodge Streets and found a semiautomatic pistol in the grass about six feet east of the sidewalk (TR. 9-10, 13, 25). Officer Rima retrieved the firearm, which appeared to have been placed in the grass recently, as it was not dirty or rusty (TR. 25).

After the traffic stop, Purdy was arrested for being a felon in possession of a firearm, for possession of a stolen firearm, on the outstanding warrant and for possession of drug paraphernalia (TR. 11). Officer Rima requested the crime laboratory check the firearm for fingerprints and DNA evidence (TR. 26, 36; Exhibits 1 and 101). Ms. Young, the supervisor on duty, has no specific recollection of Officer Rima's request and stated she has never been

involved in taking a buccal swab as part of her duties (TR. 62-65). Purdy testified that on October 15, 2004, shortly after his arrest, he agreed to give Officer Rima a DNA sample by submitting to a mouth swab and to have his hands swabbed, which was done at that time (TR. 97, 101, 114).

On April 10, 2005, Purdy was being held in custody at the DCCC after a state court found probable cause to bind Purdy's criminal firearm charge over to the state district court for trial (TR. 60-61). On April 10, 2005, Sergeant Reyes told Detective Schlapia[1] to go to DCCC to obtain a buccal swab from Purdy (TR. 39-40). A buccal swab is a swab of the mouth between the cheek and teeth near the cheek bone and is used to obtain a DNA sample (TR. 40, 49). Sergeant Reyes told Detective Schlapia the request had been made by Deputy County Attorney Stephanie Shearer (Ms. Shearer) (TR. 41). Detectives Schlapia and John Edward contacted Purdy, who refused to give the swab without a court order (TR. 41-42, 105-06). Although Detective Schlapia believed the swab was authorized by Nebraska statute §29-3304, without a court order, Detective Schlapia decided not to forcibly take the swab at that time (TR. 42, 50). No court order was issued in Douglas County to take a swab from Purdy (TR. 88-89).

On April 14, 2005, Detective Schlapia reinitiated contact with Purdy by telephone and asked for Purdy's cooperation with the swab (TR. 43). Purdy refused (TR. 43). Detective Schlapia asked Purdy whether he would cooperate if Purdy's attorney recommended it. Purdy continued to refuse, even though Ms. Shearer spoke with Purdy's attorney, who agreed to the swab (TR. 43). Purdy informed Detective Schlapia that he (Purdy) had given a DNA sample when he was arrested, however Detective Schlapia could not locate nor find any evidence of the sample (TR. 44).

On April 14, 2005, at approximately 5:00 p.m., Detectives Schlapia and Edwards went to DCC in order to transport Purdy to the police station to obtain the buccal swab (TR. 44). Upon the detectives arrival at DCC, Purdy, initially, refused to come out to talk to the detectives (TR. 44). However, Purdy was brought down to the intake area of the DCC.

---

[1] Detective Schlapia has been with the OPD for approximately six years (TR. 38-39).

3

Detective Schlapia told Purdy he would have to be handcuffed (TR. 45). Purdy walked in front of the corrections officer, Officer Samson, who told Purdy to stop (TR. 46, 52, 74). Purdy was yelling and cursing at Detective Schlapia (TR. 56-57). When Purdy continued, Officer Samson put his hand on Purdy's shoulder (TR. 52). Purdy acted in an aggressive manner by shrugging away from and turning toward the officer (TR. 52, 56, 108). Officer Samson grabbed Purdy and took him to the ground by placing his arms under Purdy's arms and onto Purdy's head to apply downward pressure (TR. 52-53, 74-75). Purdy struggled with the officer, so Detectives Schlapia and Edwards and Officer Doll assisted several other officers to handcuff Purdy (TR. 46, 53, 55, 59, 74, 76-77). Officer Doll placed handcuffs on Purdy and double locked them (TR. 75). Officers also placed Purdy in leg irons (TR. 75, 82, 109). During the course of the encounter, a "Code Blue," indicating an emergency distress where officers need assistance, was called and additional officers arrived (TR. 76, 81).

Detective Schlapia decided that because Purdy was already restrained and being held by several officers he (Detective Schlapia) would then take the buccal swab (TR. 46). Purdy's was held on the ground with his right cheek on the floor (TR. 46-47). Detective Schlapia asked Purdy to open his mouth, but he initially refused (TR. 47, 84). Sergeant Aldrich held Purdy's head by placing one hand on Purdy's forehead and one hand behind his head (TR. 83). Another officer started to force Purdy to open his mouth, when Purdy voluntarily opened his mouth (TR. 47). Detective Schlapia used a ten to twelve-inch wooden Q-tip with cotton on one end to swab the inside of Purdy's cheek (TR. 47). Purdy cooperated for a second swab (TR. 47).

Detective Schlapia noticed Purdy was spitting blood after he was taken to the floor by the corrections officer (TR. 47-48). Detective Schlapia did not know how Purdy was injured (TR. 48). Because a "Code Blue" was called, Purdy was taken to the medical department as part of the standard procedure and at Purdy's request (TR. 77; Exhibit 103 - medical records).

## LEGAL ANALYSIS

The defendant argues the evidence obtained on April 14, 2005, during the course of the warrantless search of his person should be suppressed because the evidence was

4

obtained unlawfully. Specifically, the defendant argues the officers used excessive force to obtain a buccal swab without previously obtaining a court order or his consent. The defendant contends the search violates his substantive due process rights and the state statute authorizing the search is unconstitutional.

> [T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.

***Schmerber v. California***, 384 U.S. 757, 768 (1966). Further, "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any [ ] intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained." ***Id.*** at 769-70. For these reasons such a search generally requires a warrant or its equivalent.

> The requirement that a warrant be obtained is a requirement that inferences to support the search "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

***Id.*** at 770 (internal citations omitted). Therefore, the Nebraska statutory provisions authorizing a buccal swab without a warrant or court order must comply with the Fourth Amendment's protections.

The state of Nebraska has a series of statutes which govern the taking of "identifying physical characteristics" from a person. Relevant here, "the terms identifying physical characteristics or identification procedures shall include but not be limited to fingerprints, palm prints, footprints, measurements, handwriting exemplars, lineups, hand printing, voice samples, blood samples, urine samples, saliva samples, hair samples, comparative personal appearance, and photographs of an individual." Neb. Rev. Stat. § 29-3301. Generally, an

order authorizing such identification procedures must be issued. **See** Neb. Rev. Stat. § 29-3302. Such order is issued

> [U]pon a showing by affidavit of a peace officer that (1) there is probable cause to believe that an offense has been committed; (2) that procurement of evidence of identifying physical characteristics through nontestimonial identification procedures from an identified or particularly described individual may contribute to the identification of the individual who committed such offense; and (3) that the identified or described individual has refused, or there is reason to believe he will refuse, to voluntarily provide the desired evidence of identifying physical characteristics.

Neb. Rev. Stat. § 29-3303.

The Nebraska statutory provisions specify, however, that an order is unnecessary under certain circumstances. Neb. Rev. Stat. § 29-3304 provides:

> No order shall be required or necessary where the individual has been lawfully arrested, nor under any circumstances where peace officers may otherwise lawfully require or request the individual to provide evidence of identifying physical characteristics, and no order shall be required in the course of trials or other judicial proceedings.

Pursuant to section 29-3304 a court order need not be issued when a saliva or blood sample is taken from an individual who was lawfully arrested. **See** *Nebraska v. Buckman*, 613 N.W.2d 463, 475 (Neb. 2000) (saliva sample); *Nebraska v. Freeman*, 571 N.W.2d 276, 287 (Neb. 1997) (blood sample). The defendant does not dispute that he was in custody after being lawfully arrested at the time of the buccal swab. Rather, the defendant contends the swab was taken with excessive force pursuant to an unconstitutional state statute.

The Nebraska Supreme Court held in *Nebraska v. Swayze*, 247 N.W.2d 440, 442-43 (Neb. 1976) that "the Identifying Physical Characteristics Act is constitutional." The court reasoned the Act is "rife with safeguards designed to protect the individual from whom physical evidence is sought." *Id.* at 443. In *Swayze*, the defendant was required under the Act to submit to a blood test, the results of which were admitted against her at a trial. The *Swayze* court held the defendant suffered no Fourth Amendment violation because the

6

process in obtaining a court order, as was done in *Swayze*, was similar to the procedure required to obtain a search warrant. *Id.* at 443-44.

More recent Nebraska courts similarly upheld the application of the Act where samples were taken without a court order. **See, e.g., *Buckman***, 613 N.W.2d at 475. In *Freeman*, the defendant refused to cooperate with a court order allowing a blood sample be taken. Freeman argued forcibly taking the sample was not authorized by the order which specified Freeman would be held in contempt for failure to comply. The *Freeman* court determined the court order was unnecessary given the plain language of section 29-3304 and the fact Freeman had been lawfully arrested. *Freeman*, 571 N.W.2d at 287.

The defendant contends that allowing samples to be taken without a court order, under section 29-3304, allows officers to bypass the procedural safeguards contained in section 29-3303. However, section 29-3304, by its nature, incorporates the same procedural safeguards. Section 29-3304 cannot be read without the probable cause requirements. In this case, Purdy had been lawfully arrested and was confined based on the state court's probable cause determination that Purdy had committed the firearm offense. Further, there is no dispute the buccal testing "may contribute to the identification of the individual who committed such offense" and that Purdy refused to voluntarily provide the requested sample. Similar to the circumstances in *Swayze*, the sample was taken based on conclusions made by a neutral and detached judiciary. Accordingly, the court finds no constitutional violation in the application of the Act to the defendant.

The defendant also argues the buccal swab was not taken in a reasonable manner because of the amount of force used to obtain the swab. However, the force used against Purdy immediately before the swab was not based on an attempt to force compliance with the test, but due to Purdy's conduct and refusal to cooperate with the commands of corrections officers. The altercation with officers, including taking Purdy to the ground and physical restraints, occurred regardless of the timing of the swab. Although the incident was clearly unpleasant for Purdy, the evidence shows the actual buccal swabbing was done by Detective Schlapia in a reasonable manner. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Anthony P. Purdy's Motion to Suppress (Filing No. 14) is denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 12th day of October, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge